### In re STANSBURY.

No. 6728.

United States District Court
W. D. Louisiana,
Shreveport Division.

Jan. 7, 1952.

Tooke & Tooke, Shreveport, La., for bankrupt.

Morgan, Baker & Skeels, Shreveport, La., for Pioneer Bank & Trust Co.

Dimick & Hamilton, Shreveport, La., for trustee.

DAWKINS, Chief Judge.

This is the third time the above case has been before this court for review. On the first occasion, the judgment by the Referee in favor of the Trustee was set aside, the court holding that the lien arising from the attachment should be recognized, unless the bankrupt was insolvent at the time it was levied. D.C., 83 F.Supp. 124. Authorities were cited, and see additionally, Board of Supervisors of Louisiana State University v. Hart, 210 La. 78, 26 So.2d 361, 174 A.L.R. 1366. The matter was remanded to receive evidence on the question of solvency, which had not been tried the first time, the Referee having held that the attachment lien was invalid, regardless of solvency.

At the hearing on the question of insolvency after the remand, the Referee based his findings mainly on the figures given as to assets and liabilities in the schedules filed by the bankrupt. On application for review, this court held this should not have been done, because the burden was upon the trustee to support his demand by a fair preponderance of the evidence. D.C., 97 F.Supp. 250. See Liberty National Bank v. Bear, 265 U.S. 365, 369, 44 S.Ct. 499, 68 L.Ed. 1057, and authorities cited therein.

The real property of the bankrupt had been sold through foreclosures of two uncontested mortgage liens, leaving a balance in the hands of the sheriff, and since the privilege under the attachment had been reduced to judgment and recorded, the sheriff had prepared to pay the remaining funds over to the Pioneer Bank and Trust Company, defendant in the present proceeding. However, on the last

day preceding the sale at foreclosure, on October 22, 1947, or on October 21 of that year, Stansbury filed a voluntary petition and was adjudicated a bankrupt. After the trustee was selected, this proceeding, as a summary action, was instituted to compel the paying over to him of the remaining funds for distribution among general creditors.

In its second ruling, the court had held that since the burden was upon the trustee to prove insolvency, this had to be done by proper evidence, instead of the use of the schedules. Hence, the matter was again remanded both on the correctness of the amount of the indebtedness and for the purpose of evaluating the property on the basis of such evidence as might be produced. However, defendant filed a motion for rehearing on this second ruling, in which the trustee joined, and it was granted. All that was done thereafter was to offer three affidavits on July 13, 1951, on behalf of the trustee. They were as follows:

1) By Sapaugh, who had been a witness of the trustee at the hearing on the issue of solvency on the first remand. It stated that he had worked for and was acquainted with the bankrupt "for many years," that he was familiar with the duplex apartment which had been included in the foreclosure, that he had visited Stansbury in this apartment on several occasions, that the furniture consisted of one living-room suite, one dining-room suite, two bedroom suites, and one kitchen suite, the latter consisting of a stove, refrigerator, kitchen cabinets, etc.; and that shortly after filing the petition in bankruptcy, the furniture *"was sold,"* was placed in storage, where it remained "until it *was sold* by Stansbury to Frank J. Zuzak a few weeks ago." This affidavit was executed on July 9, 1951 (the adjudication in bankruptcy, as stated earlier, was on October 21, 1947);

2) The second affidavit was by the said Zuzak to the effect that he had paid to the bankrupt for said furniture after its remaining in storage almost four years the sum of $350.00, "which affiant considered to be a fair and reasonable value and price for this said used furniture"; and

3) The third affidavit was by L. H. Snow, to the effect that he was a partner in the firm of Snow & Bryan, that the bankrupt "was indebted to" his said firm "in the amount of $255.90, being a balance due on insurance premiums," which was due and unpaid since "prior to August 22, 1947, the day before the attachment was run."

These affidavits add little or nothing to the sum of the evidence on the question of solvency. Inasmuch as this controversy has continued for some four years, and it is in the interest of justice that it come to an end, the court will proceed to dispose of the matter on the record as it now stands. Since the defendant has not insisted upon further hearing in which the correctness of any of the ordinary claims amounting to more than $2000 could be determined, the indebtedness found by the Referee of $13,295.59 will be adopted. Of course, the determining date of solvency was August 23, 1947, when the attachment lien arose.

First as to the real estate. Ordinarily, the court will give serious weight to the findings of fact by a Referee. However, as stated earlier, the burden was upon the Trustee to prove by a fair preponderance of the evidence the insolvency of Stansbury when the attachment was levied; and while three real estate brokers, or realtors, testified, one for the Trustee, and two for the defendant, the Referee chose to accept that of the first, largely, and to give little weight to the evidence of those appearing for the defendant. Plaintiff's broker placed a considerably lower value on both parcels of the real estate than did the two witnesses for the Bank. The record shows there was apparently little difference in the qualifications of these experts. They have appeared in person to testify before this court on other matters. The Referee reviewed the circumstances of the property having been bought in at foreclosures by a representative of the defendant for the sum of $8800, and which was admittedly transferred to J. Murray Durham, Jr., also an officer of the defendant

Bank, the Referee says for the same figure. However, Durham swore that while he paid Foster that figure, he also assumed the amount due the bank, or a total consideration of $11,500.00. Durham, on May 14, 1948, sold the duplex apartment on Highland Street to one Charles Campbell and another for $10,500 and later sold the two lots on Lillian Street to L. K. Barney for $1000. Durham testified that when the property was bought in by the Bank in the name of Foster, since the Bank had been assisting in the financing of housing accommodations for veterans, it had the appraisers of the Veterans Administration place a value on this duplex, which was $11,500.

It is thus seen that the real estate consisting of the apartment building and the two lots brought a total of $11,500. Ordinarily, this evidence of private sale would be entitled to considerable weight in determining the fair value of the real property as of August 23, 1947, but of course it is not conclusive. There is nothing to show that either Foster or Durham, officers of the Bank, were buying or selling real estate, or that either the duplex or the lots carried any appeal to them for their own purposes, as would have been the case of persons buying for living quarters or investment. Their main purpose appears to have been to aid the Bank in collecting its indebtedness as promptly as possible. For these reasons, the prices paid must be treated in the light of those circumstances, along with the testimony of the real estate brokers. Of course, all testimony as to values, other than actual sales by willing sellers who do not have to sell, to willing purchasers who do not have to buy, at last represents merely the opinion of the witness and must be weighed in the light of their experience and proven qualifications. As stated, these witnesses appear to stand on substantially equal footing in this respect.

Mr. May places a value of $9000 on the duplex, stating that this was all that it was worth, notwithstanding it had been sold by Durham to Campbell and another a few months later for $10,500, and in spite of the fact that the witness admitted that in August, 1947, conditions in the real estate business were what is called a "seller's market."

The first broker called by defendant, Bonham Anderson, had been in the real estate business for fourteen years, beginning in the office of the witness for the plaintiff, May, for about one year, and then for W. H. Stephens, until his death, for a period of several years with Charles Brandon, and then back with May some three or four years. He finally went into the business for himself some five years before being called as a witness in this case. Anderson fixed the value of the duplex at $11,500, and the two vacant lots at $700 each, or $1400, thus making a total valuation of the real estate of the bankrupt at the date in question of $12,900, as against May's figures of $9,900, a difference of $3000.

The second real estate broker called for defendant was O. L. Jordon, who testified that he had been a member of the local real estate board since 1946; that he had been in the business of building houses, buying and selling real estate since 1934, and was, when testifying, president of the Shreveport Real Estate Board. He also was then acting as an appraiser for the Veterans Administration, which took up practically all of his time. The value which he placed on the duplex was $12,000. His figures on the vacant lots on the paved street were $750.00 each, or a total of $1500 for the two, thus making a total appraisal for the real estate of $13,500.

Giving due consideration to all of this evidence, it is the view of this court that the duplex on the date in question was worth $11,000, and the lots, $1200, or a total of $12,200.

As to the value of the furniture, which the Referee fixed at $350, the evidence shows that it was finally sold for that sum shortly before the hearing on the question of solvency after remaining in storage for some four years, as stated above. Without going into detail, the values fixed by the witnesses on the furniture ranged from this figure up to $2000. If it sold for $350 after being in storage, as indicated, it must have been worth considerably more when placed there, as anyone with experience in such

matters knows. It consisted of the various suites above described by the witnesses. The bankrupt had also installed an attic fan at a cost of some $400 shortly before the property was foreclosed, but which appears to have become an immovable by destination. However, its value should be considered either in connection with the house or the furniture. It certainly cannot be ignored. The furniture must be valued not at what it would bring sold second-hand after long storage, but on the basis of its reasonable worth in the position which it occupied on August 23, 1947, which anyone desiring it for that continued use would have been willing to pay. It is the court's view that taking all the facts and circumstances into consideration, the furniture must be valued at least for twice the sum it brought, or $700.00.

The bankrupt also held a note of one Sam Jackson for $136.00, secured by a chattel mortgage on an old automobile. There is no evidence in the record as to the value of this car or of the financial responsibility of Jackson, other than that of the Trustee, who after his appointment and qualifications attempted to collect it. At that time, he found Jackson to be a colored man with a large family, and the car in dilapidated condition. The debtor paid the sum of $15.00 on the note.

The Referee also found the value of what was called "Junker" automobiles owned by the bankrupt on the date involved to be $750.00. In addition to this, shortly before the attachment suit was filed, Stansbury had taken some half a dozen cars to Texas and elsewhere, in violation of his contract with the defendant, all but two of which were sold, and he kept the proceeds of at least some of them. The indications are that this amounted to several hundred dollars. For some reason, the bankrupt got his discharge apparently without having been called to account for these funds or to help in any manner in throwing light on the conditions of his affairs. Of course, whatever sum he had at the time of attachment should have been taken into consideration in determining whether he was solvent or not.

However, adding up the total values found here, it is the view of the court that the bankrupt's financial condition was as follows:

### Assets

| | |
|---|---|
| One duplex apartment and lot | $11000 |
| Two vacant lots | 1200 |
| Total real estate | $12200 |
| Furniture | $ 700 |
| Sam Jackson's note | 15 |
| Junker automobiles | 750 |
| Total | $ 1465 |
| Total Assets | $13665.00 |

Amount of cash on hand, probably several hundred dollars.

### Liabilities

The Referee has included interest on defendant's claim "of $271.31 as of date of the suit," and in addition $602.71, attorney's fees, plus costs of $15.00. The claim of Motor Securities Company had been reduced to judgment before the bankruptcy and was paid out of the proceeds of the real estate, which the Referee states was $671.00, with costs of $124.50. How this large cost bill was incurred is not explained. However, as stated earlier, the Referee's findings as to liabilities have evidently been accepted by both sides as amounting to $13,295.59.

Therefore, it is the conclusion of this court that the financial status of the bankrupt on the crucial date was as follows:

| | |
|---|---|
| Assets | $13,665.00 |
| Liabilities | 13,295.59 |
| (Subtract excess of assets over debts) | $ 369.41 |

While ordinarily the court would hesitate to reverse the Referee on this small difference, yet when it is considered that the bankrupt could have been forced by the Referee to give an account of his affairs before getting his discharge, this evidently was not done, and for which there appears no explanation. Hence, it must be assumed that the plaintiff has not only failed to make out his case by a fair preponderance of the evidence, but has allowed important evidence which would have thrown light thereon to escape.

Parenthetically, it may be said that the defendant in this case is, primarily, the victim of the bad faith of the bankrupt. It furnished the money to finance his automobile business on the promise that as cars were sold, their proceeds should be applied on the Bank's loan. The failure to take chattel mortgages on the cars was due to the circumstances that Stansbury was buying cars in other places which he would bring to Shreveport for sale, and of course, had to pay the sellers before getting possession, which was done by draft on defendant or otherwise to facilitate his business. Then, too, if mortgages had been placed on the stock and trade in a going business, it would have interfered with a free and prompt dealing with customers. In other words, instead of furnishing legal security, he was trusted by the Bank, and the defendant has much equity in its favor, certainly as against the bankrupt; and while this cannot defeat the legal rights of the Trustee as the representative of general creditors, it is a circumstance requiring clear proof that the plaintiff has made out a case.

There should be judgment for the defendant rejecting the plaintiff's demand.